# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>JACKY POTEAU and<br>CARLINE POTEAU,<br><br>          Debtors<br>———————————————<br><br>SMITH VIL,<br><br>          Plaintiff<br><br>v.<br><br>JACKY POTEAU and<br>CARLINE POTEAU,<br><br>          Defendants<br>———————————————<br><br>JACKY POTEAU,<br><br>      Plaintiff-in- Counterclaim<br><br>v.<br><br>SMITH VIL,<br><br>      Defendant-in-Counterclaim | Chapter 7<br>Case No. 09-17731-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 13-1346 |

### MEMORANDUM OF DECISION ON
### COMPLAINT FOR REVOCATION OF DISCHARGE,
### COUNTERCLAIM FOR CONTEMPT OF DISCHARGE INJUNCTION,
### AND MOTION FOR SANCTIONS UNDER RULE 9011

In the matters presently before the Court, alleged creditor Smith Vil seeks revocation of the discharge entered in favor of chapter 7 debtor Jacky Poteau; Jacky counterclaims for a determination that Vil is in contempt of the same discharge; and debtor Carline Poteau moves for sanctions against Vil under Fed. R. Bankr. P. 9011(b)(1), (2), and (3) for filing the complaint herein against her without a

reasonable factual basis for doing so.  For the reasons set forth below, the Court will dismiss the complaint for revocation, award sanctions for contempt of the discharge, and deny relief under Rule 9011.

**PROCEDURAL HISTORY**

On August 13, 2009, Jacky Poteau ("Jacky") and Carline Poteau ("Carline") (together, "the Debtors") filed a joint petition for relief under Chapter 13 of the Bankruptcy Code.  With their petition, the Debtors filed a Schedule of Personal Property, known as Schedule B, and a Statement of Financial Affairs (SOFA).

On September 21, 2011, while the bankruptcy case remained in Chapter 13, Smith Vil ("Vil") filed a complaint against Jacky and others in the United States District Court for the District of Massachusetts, Civil Action No. 11-cv-11622-DJC. The complaint included intellectual property claims against Jacky.

The bankruptcy case remained in Chapter 13 until May 24, 2012, when the Debtors moved to convert their case to one under Chapter 7, and, on the same day, their motion was granted. On May 30, 2012 and in conjunction with the conversion to Chapter 7, the Debtors filed a Notice of Post-petition Creditors in which they listed Vil as a post-petition unsecured creditor but also indicated that they disputed the validity of his claim.  The Court promptly notified Vil of the bankruptcy case and of the deadline for filing an objection to discharge. In due course, the chapter 7 trustee filed a report of no distribution.  No objection to discharge having been filed, the Debtors received a discharge under 11 U.S.C. § 727 on August 28, 2012, and Vil was so notified. The case was closed on September 4, 2012.

On November 28, 2012, the District Court dismissed some or all the claims in Vil's District Court complaint but also granted Vil leave to amend his intellectual property claims. On January 9, 2013, Vil filed an amended complaint that asserted claims against Jacky for copyright infringement, unfair competition, and breach of an implied contract. On January 11, 2013, Jacky filed a counterclaim against

Vil for injunctive and monetary relief for Vil's violation of the discharge by prosecution of the District Court claims against him.  On January 16, 2013, Vil in turn moved to dismiss the counterclaim, arguing that a violation of the discharge does not give rise to a private right of action.

On January 30, 2013, Vil, appearing for the first time in the Poteau's bankruptcy case,[1] filed a motion in the bankruptcy court to revoke the discharge as to both Jacky and Carline. On January 31, 2013, the Bankruptcy Court struck the motion on the stated basis that the bankruptcy case was closed and no motion to reopen had been filed.

Back in the District Court, on February 1, 2013, Jacky and the other District Court defendants moved jointly to dismiss Vil's amended complaint under Fed. R. Civ. P. 12(b)(6), and Jacky also moved separately to dismiss the claims against him as barred by the discharge he had received in bankruptcy.

The action then returned to the Bankruptcy Court. On February 12, 2013, the Debtors filed a motion to reopen their bankruptcy case so that they could amend the SOFA they had filed earlier in the case. On March 26, 2013, the Court granted the motion and reopened the case. On March 27, 2013, the Debtors moved for leave to file an amended SOFA, specifically to amend their answer to Item 18 by listing nine entities.  As an attachment to this motion, the Debtors filed their proposed amended SOFA. On April 11, 2013, the Court allowed the motion for leave to amend.

On July 26, 2013, the District Court, by Judge Casper, acted on the motions then pending in the District Court action. For the reasons she articulated in a Memorandum and Order of that date, Judge Casper denied the defendants' joint motion to dismiss under Rule 12(b)(6), dismissed Vil's claims against Jacky as barred by the discharge, denied Vil's motion to dismiss Jacky's counterclaim for contempt of the discharge, and, pursuant to District Court Local Rule 201, referred the counterclaim to the Bankruptcy Court for adjudication.

---

[1] Vil has at all times appeared pro se.

On August 27, 2013, Vil filed in the Bankruptcy Court the complaint that commenced the

present adversary proceeding. It names both Jacky and Carline as defendants. In each of its two counts,

one under 11 U.S.C. § 727(a) and the other under 11 U.S.C. § 727(d), the complaint seeks revocation of

the discharge as to both Jacky and Carline. It also demands an order requiring the Debtors "to pay

damages to Plaintiff related to any expenses incurred related to this case."  In support of both counts,

the complaint alleges that the Debtors obtained their discharge by fraud and that he, Vil, did not know

of the fraud until after the discharge was granted. The complaint identifies the following alleged

misstatements and omissions from the Debtors' initial schedule of real property and SOFA and amended

SOFA:

1.  that "after petition date and before discharge" (sic), the Debtors owned rental property in

    Mirebalais, Haiti, and they knowingly failed to disclose this property in their original

    schedules, which they filed under oath (¶¶ 28, 29, 31, 33);

2.  that "after petition date and before discharge" (sic), the Debtors owned rental property in

    Mirebalais, Haiti, and they knowingly failed to disclose this property "in the February 2013

    amendment" (¶¶ 28, 29, 31, 33);

3.  that the nine organizations that the Debtors listed in the February 2013 SOFA are

    organizations that the Debtors "are or were" involved in on the petition date, and that the

    Debtors omitted these organizations from their original schedules and SOFA, which they

    signed under penalty of perjury, knowing the omissions to be false (¶¶ 19,21, 33); the

    complaint does not indicate where in the original schedules and SOFA these organizations

    should have been listed and why;

4.  that in the original SOFA, which the Debtors filed under oath, the Debtors falsely listed their

    interests in GPN Management, Inc., knowing their listing to be false (¶¶23, 33); the

    complaint does not indicate how the listing of GPN Management, Inc. was false;

5.  that in the February 2013 amendment to the SOFA, which they signed under penalty of

    perjury, the Debtors falsely listed their interests in GPN Management, Inc., knowing their

    listing to be false (¶¶23, 33); the complaint does not indicate how the listing of GPN

    Management, Inc. was false;

6.  that in their SOFA (the complaint does not specify which), the Defendants falsely listed the

    type of business of GPN Management, Inc. (¶24); and

7.  that in the February 2013 amendment to the SOFA, which they signed under penalty of

    perjury, the Debtors falsely described the business nature of GPN Management, Inc., as

    "development of local business opportunities in Mirebalais, Haiti" (¶22).

Though the complaint identifies the above omissions and misstatements, it does not say that each of

these constitutes an instance of fraud on which the complaint for revocation is predicated. In fact, the

complaint does not specify precisely which of the above misrepresentations constitute the fraud on

which Vil is relying.

On November 4, 2013, Jacky and Carline filed a joint motion to dismiss Vil's complaint for failure

to state a claim on which relief could be granted.  After a hearing on the motion, the Court took three

actions.  First, the Court dismissed Count I as to both defendants on the basis that where the discharge

had already entered, an objection to discharge under § 727(a), Vil's stated basis for Count I, was moot.

Revocation of a chapter 7 discharge is governed exclusively by § 727(d). Second, the Court dismissed

Count II as to Carline; this was prompted by Vil's admission at the hearing that, although the complaint

alleged throughout that the Debtors jointly, not just Jacky, had engaged in the conduct that formed the

basis of the complaint, in fact he had no knowledge that Carline had engaged in any of that conduct.

Third, the Court denied Jacky's motion to dismiss as to Count II, for revocation of discharge under §

727(d), ruling that the complaint did not fail to state a claim on which such relief could be granted.

Upon receipt of Vil's complaint, the Court ordered that Jacky's counterclaim—the counterclaim he had filed in the District Court action and that the District Court had since referred to the Bankruptcy Court—would be deemed to have been filed in the present adversary proceeding. Jacky then moved for and was granted leave to file an amended counterclaim, and, on January 15, 2014, he filed an amended counterclaim ("the Counterclaim").  The Counterclaim seeks a determination that, by his prosecution of the District Court action against Jacky after entry of the discharge, Vil was in contempt of the discharge injunction, and for such contempt the Counterclaim demands (i) sanctions in the amount of $50,000 to deter further contempt and retaliatory conduct, (ii) an order permanently enjoining Vil from filing any petition or request for relief against Jacky and Carline without first satisfying certain conditions, and (iii) reasonable attorney's fees and expenses.

Carline then filed a motion for sanctions against Vil under Fed. R. Bankr. P. 9011(b)(1), (2), and (3) for filing the complaint in this adversary proceeding against her without a reasonable factual basis for doing so (both counts), without warrant in existing law (Count I only), and solely to harass (both counts) (the "Rule 9011 Motion"). Vil filed an opposition to the motion, denying that his complaint against Carline was brought for an improper purpose, in bad faith, or without a reasonable factual basis, and arguing that he should not be sanctioned "for simply trying his best to navigate a complicated judicial system without legal training." After a preliminary hearing on this motion, the Court ordered that it be continued for an evidentiary hearing, to be held together with the trial of the Complaint and Counterclaim.

The trial of the Complaint and Counterclaim and the evidentiary hearing on the Rule 9011 Motion were held together over two days. Three witnesses testified at trial: Vil, Jacky, and John Erick Noel.

At the trial, the Court asked Vil to specify the omissions and misstatements that he contends constitute the fraud on which his complaint is predicated. He specified six, all of them omissions from

the schedules and SOFA that Jacky filed with his bankruptcy petition.  Vil indicated that he is relying on

Jacky's omission from his response to item 18 in the original SOFA of his positions with (i) FATEM, (ii)

GPN Management, Inc., and (iii) Oasis Global Enterprises, Inc.; on Jacky's omission from his schedule of

real property of (iv) a rental property in Haiti and of (v) a vacant lot in Haiti; and on Jacky's omission

from his schedule of personal property of (vi) a truck. Of these six, two—the vacant land in Haiti and the

truck—were not mentioned at all in the complaint. There is no indication in the record that Jacky was

afforded any notice at all that the fraudulent omissions of these two assets were counts against which

he would have to defend at trial.

On the basis of the evidence adduced at the trial/evidentiary hearing, the Court now enters the

following findings of fact and conclusions of law as to the complaint for revocation, the counterclaim,

and the Rule 9011 motion.

**FINDINGS OF FACT**

1.      In the early 1990s, Jacky Poteau and Smith Vil separately moved to the United States,

and specifically to eastern Massachusetts, from their native Haiti. They have known each other since

2006. In July of that year, they founded a nonprofit corporation, the Foundation for the Technological

and Economic Advancement of Mirebalais, Inc., known by its acronym in French, FATEM.  Its purpose is

to provide aid of various types, including potable water and tuition assistance, to Haitians living in

Mirebalais, Haiti, from which both Jacky and Vil derive. FATEM is registered as a § 501(c)(3) corporation

and, being nonprofit, has no shareholders. It raises funds in the United States and Canada and, with

those funds, implements programs in Haiti. In its early years, both Vil and Jacky held leadership positions

in FATEM. Their discussions with each other were almost entirely about FATEM. On a number of

occasions, Jacky went to Vil's house to discuss FATEM business with him. Vil is a graduate of Stonehill

College and works as an accountant. His work for FATEM was entirely of a volunteer nature; he was

never employed by FATEM or compensated for his work. In the summer of 2009, Vil and Jacky and four

others were members of FATEM's board of directors.

2.       On August 13, 2009, Jacky and his wife Carline filed a joint petition for relief under

Chapter 13 of the Bankruptcy Code.  With their petition, they filed schedules of real and personal

property and a Statement of Financial Affairs (SOFA).

3.       Item 18 of the SOFA instructed the Debtors as follows:

> If the debtor is an individual, list the names, addresses, taxpayer-
> identification numbers, nature of the businesses, and beginning and
> ending dates of all businesses in which the debtor was an officer,
> director, partner, or managing executive of a corporation, partner in a
> partnership, sole proprietor, or was self-employed in a trade,
> profession, or other activity either full- or part-time within six years
> immediately preceding the commencement of this case, or in which the
> debtor owned 5 percent or more of the voting or equity securities
> within six years immediately preceding the commencement of this case.

In response to this item, the Debtors answered "none." Each Debtor signed the SOFA, thereby affirming

what was written immediately above their signature lines: "I declare under penalty of perjury that I have

read the answers contained in the foregoing statement of financial affairs and any attachments thereto

and that they are true and correct."

4.        In their schedule of real property, known as Schedule A, which required that the

Debtors list each of their interests in real property, they listed no real estate located in Haiti. Item 25 of

the schedule of personal property, known as Schedule B, required that they list any automobiles and

trucks in which they had interests. They listed three vehicles but not a Mack dump truck. Each Debtor

also signed a Declaration Concerning Debtor's Schedules, thereby affirming what was written

immediately above their signature lines: "I declare under penalty of perjury that I have read the

foregoing summary and schedules, consisting of 22 sheets, and that they are true and correct to the

best of my knowledge, information, and belief."

8

5.      In September 2009, less than a month after the bankruptcy filing, Vil and the other members of FATEM's board of directors had a falling out. The other members had come to regard Vil as "not a team player" and "trying to control everyone." "It was his way or the highway," Jacky testified. They believed his interventions in meetings had "contributed to pushing people away from FATEM, rather than attracting them," despite repeated unsuccessful efforts to bring his attention to the consequences of his actions.  Consequently, Jacky and three other members of the board voted to remove Vil from the board and from FATEM's executive committee, effective immediately.  On September 9, 2009, these four members sent Vil a letter, notifying him of this action.

6.      In 2010, Jacky left the job he had held for some 18 years, including at the time of his bankruptcy filing, and, at the request of FATEM's board of directors, went to work for FATEM as its executive director.  FATEM paid him a salary for this work, but considerably less than he had been receiving in his previous position.

7.      At some point in 2010 there occurred a series of events involving Jacky and Vil. Jacky testified that he became aware that long after Vil's authority to act for FATEM had been terminated, Vil had withdrawn some $40,000 from a FATEM bank account. When Jacky became aware of this, he reported it to the police and filed a larceny charge against Vil. When Vil learned of the charge against him, he was greatly distressed. Among other things, he feared being arrested in front of his family or at work, losing his job, becoming unemployable in the financial industry, and, not least, being denied American citizenship, his application for which was then pending. When the charge was heard in court, Vil came with an attorney and Jacky was there alone. According to Jacky: "the clerk found probable cause, but Smith Vil explained that he had to go for his citizenship test and he and his lawyer pleaded that, you know, if we went -- if we moved forward with that charge it would impact his ability to get his citizenship and I was asked whether I wanted to let it go. I asked to get in touch with the board members at the time and I was told that I had to be silent on this part. So . . . I searched it in my heart

and, you know, we formed this in our country and we just wanted to help in Haiti and for me to prevent

him from becoming a citizen, and that wasn't in me. And I said, 'Well, let's just let it -- leave it at that.'"

Jacky decided not press charges, and the complaint against Vil was accordingly dismissed.

8.       For this act of mercy, Vil testified, he gives credit only to God, not at all to Jacky. He

faults Jacky for having gone to the police and having instituted criminal proceedings against him, at least

without first having talked to him about the underlying incident. Vil began calling Jacky, threatening to

ruin Jacky's life. These calls were intended partly as retribution for Jacky's having filed the criminal

complaint and partly as intimidation, to prevent him from making public what had happened. Jacky

obtained a protective injunction against this harassment from the Brockton District Court.

9.       Then in 2010, Vil filed at least two, and perhaps four, complaints in Massachusetts

Superior Court, against Jacky, three other directors of FATEM, and FATEM itself, for defamation of

character, intentional infliction of emotional distress, malicious intent prosecution, violation of FATEM's

bylaws as a result of Vil's removal from FATEM, and breach of fiduciary duty. These actions were

consolidated and, in September 2011, dismissed. The basis of their dismissal is not in evidence.

10.       On September 21, 2011, Vil commenced another action against the same defendants,

Jacky included, this time in the United States District Court, Civil Action No. 11 –CV- 11622-DJC. The

complaint included intellectual property claims against Jacky. At the time of the filing of this complaint,

Vil remained unaware of Jacky's bankruptcy filing.

11.       The bankruptcy case remained in Chapter 13 until May 24, 2012, when the Debtors

moved to convert their case to one under Chapter 7, and, on the same day, their motion was granted.

On May 30, 2012 and in conjunction with the conversion to Chapter 7, the Debtors filed a Notice of

Post-petition Creditors in which they listed Vil as a post-petition unsecured creditor. The Notice

indicated that the claim was based on "[c]ivil claims for breach of employment contract and violation of

intellectual property rights filed in the United States District Court, District of Massachusetts," that the

amount of the claim was $0.00, and that the claim was disputed. On June 4, 2012, the Court issued to Vil

a Notice to Added Creditors, informing him that:

- "[a] bankruptcy case concerning [the Debtors] was filed on 8/13/09";

- "[o]n May 30, 2012, schedules of creditors filed by [the Debtors] were amended to include your name";

- "[t]he filing of a bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. If you attempt to collect a debt or take other action in violation of the bankruptcy code, you may be penalized";

- "[a]ll documents filed in the case may be inspected at the bankruptcy court clerk's office";

- "[a] meeting of creditors was scheduled to be held on or will be held pursuant to 11 U.S.C. § 341(a), on 6/28/12"; and

- a "[c]omplaint objecting to the discharge of the debtor and/or to have a debt declared non–dischargeable, must be received by the bankruptcy clerk's office on or before AUGUST 27, 2012."

12.     The Court docketed the Notice to Added Creditors on June 4, 2012 and mailed it to Vil

on June 6, 2012. On June 28, 2012, the required meeting of creditors was held in the case.  Later that

same day, the chapter 7 trustee filed a report of no distribution.  No objection to discharge having been

filed, the Debtors received a discharge under 11 U.S.C. § 727 on August 28, 2012.  Two days later, the

Court mailed to Vil a copy of the discharge order with a general explanation of the acts it prohibits and

the debts to which it applies. The case was closed on September 4, 2012.

13.     On November 28, 2012, the District Court dismissed some or all the claims in Vil's

District Court complaint but also granted Vil leave to amend his intellectual property claims. On January

9, 2013, Vil, with knowledge that Jacky had received a discharge, filed an amended complaint that

asserted claims against Jacky for copyright infringement, unfair competition, and breach of an implied

contract. Vil could not afford an attorney; he did not obtain or rely upon the advice of counsel in filing or

prosecuting the amended complaint in the District Court action.

Case 13-01346    Doc 235    Filed 11/28/16    Entered 11/28/16 15:41:19    Desc Main
Document       Page 12 of 33

14.    On January 11, 2013, Jacky filed a counterclaim against Vil for injunctive and monetary relief for Vil's violation of the discharge by prosecution of the District Court claims against him.  On January 16, 2013, Vil in turn moved to dismiss the counterclaim, arguing that a violation of the discharge does not give rise to a private right of action.

15.    On January 30, 2013, Vil, appearing for the first time in the Poteau's bankruptcy case, filed a motion in the bankruptcy court to revoke the discharge as to both Jacky and Carline. In this motion as in all his appearances in the bankruptcy case, including the present adversary proceeding, Vil has appeared pro se. On January 31, 2013, the Bankruptcy Court struck the motion on the stated basis that the bankruptcy case was closed and no motion to reopen had been filed.

16.    Back in the District Court, on February 1, 2013, Jacky and the other District Court defendants moved jointly to dismiss Vil's amended complaint under Fed. R. Civ. P. 12(b)(6), and Jacky also moved separately to dismiss the claims against him as barred by the discharge he had received in bankruptcy.

17.    The action then returned to the Bankruptcy Court. On February 12, 2013, the Debtors filed a motion to reopen their bankruptcy case so that they could file an amendment to the SOFA that they had filed at the commencement of the case. On March 26, 2013, the Court granted the motion and reopened the case. On March 27, 2013, the Debtors moved for leave to file an amended SOFA, specifically to amend their answer to Item 18 by listing nine entities. As an attachment to this motion, the Debtors filed their proposed amended SOFA (the "Amended SOFA"). On April 11, 2013, the Court allowed the motion for leave to amend.

18.    The Amended SOFA differed from the original only in the Debtors' response to item 18. The instructions to the Debtors in item 18 were the same as in the original:

> If the debtor is an individual, list the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a

> partnership, sole proprietor, or was self-employed in a trade,
> profession, or other activity either full- or part-time within six years
> immediately preceding the commencement of this case, or in which the
> debtor owned 5 percent or more of the voting or equity securities
> within six years immediately preceding the commencement of this case.

This time the Debtors' response included nine entities and is reproduced here verbatim:

| NAME, ADDRESS, AND [COMPLETE EIN] | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|
| Cychama Inc.<br>P. O. Box 307<br>Dorchester, Ma 02124<br>000372318 | Church Group Choir and Band<br>Non-Profit Corp.<br>Inactive Corporation. | 09/12/1991 - 6/18/2012 |
| Foundation for the Technological and Economic Advancement of Mirebalais, Inc. (FATEM)<br>1 Centre Street, # 303<br>Brockton, MA 02301<br>205141935 | Provide Economic, Technological, Education, and Sustainable Development Programs and Practices to Mirebalais, Haiti.<br>Non-Profit Corporation | 07/04/2006 – Present |
| GPN Management, Inc.<br>135 Chittick Road<br>Boston, MA<br>203857547 | Development of local business opportunities in Mirebalais, Haiti.<br>Inactive Corporation | 12/01/2005 - 06/18/2012 |
| SODECOM, LLC<br>76 North Ash Street<br>Brockton, MA 02301<br>263815627 | Sustainable development and farming in Mirebalais, Haiti.<br>No shareholder/ownership interest. | 01/29/2009 – Present |
| Oasis Global Enterprises, Inc.<br>6367 Shadow Tree Lane<br>Lake Worth, FL 33463<br>None | Inactive Corporation.<br>No shareholder/ownership interest. | 6/02/2008 - 9/25/2009 |
| Oasis Global Enterprises LLC<br>4849 Lake Worth Road<br>Greenacres, FL 33463<br>452548395 | Construction job training and local business/real estate development in Mirebalais, Haiti.<br>No shareholder/ownership interest. | 06/15/2011 – Present |
| 1000 Jobs/Haiti, Inc.<br>316 West Main Road<br>Little Compton, RI 02837<br>000509175 | Job creation and economic development in Mirebalais, Haiti.<br>Non-profit corporation | 07/30/2009 – Present |
| National Haitian American Health Alliance, Inc.<br>1278 Dutch Broadway<br>Valley Stream, New York, 11580<br>None | Coordination of health services and programs in Haiti.<br>Non-profit Corporation | January 2010 - December 2012 |

| Destined for Grace Children's Relief P.O. Box 925 Carpinteria CA 93014 Unknown | Education for children in Haiti Non-Profit Corporation | August 2008 - December 2012 |
|---|---|---|

19.     The Amended SOFA was dated February 21, 2013, and was signed by both debtors,

Jacky and Carline, who thereby affirmed what was written immediately above their signature lines: "I

declare under penalty of perjury that I have read the answers contained in the foregoing statement of

financial affairs and any attachments thereto and that they are true and correct." For each listed entity,

the Debtors' response did not indicate, and was not required to indicate, (i) the connection to the entity

that constituted the basis for listing that entity or (ii) which of the two debtors had the connection that

required the listing of that entity. The Debtors appear to have listed two entities that they need not

have listed because, according to the Debtors' response to this item, neither entity was in existence in

the six years before the commencement of their bankruptcy case:  Oasis Global Enterprises LLC

(beginning date June 15, 2011) and National Haitian American Health Alliance, Inc. (beginning date

January 10, 2010). I therefore find that the Debtors listed some entities whose disclosure was not

required, and that their listing of an entity is not by itself proof that that entity should have been listed

in their original SOFA.

20.     On July 26, 2013, the District Court, by Judge Casper, acted on the motions then pending

in the District Court action. For the reasons she articulated in a Memorandum and Order of that date,

published as *Vil v. Poteau*, 2013 WL 3878741 (D. Mass. July 26, 2013), Judge Casper denied the

defendants' joint motion to dismiss under Rule 12(b)(6), dismissed Vil's claims against Jacky as barred by

the discharge, denied Vil's motion to dismiss Jacky's counterclaim for contempt of the discharge, and,

pursuant to District Court Local Rule 201, referred the counterclaim to the Bankruptcy Court for

adjudication.

21.    On August 27, 2013, Vil filed in the Bankruptcy Court the complaint that commenced

the present adversary proceeding. It names both Jacky and Carline as defendants. In each of its two

counts, one under 11 U.S.C. § 727(a) and the other under 11 U.S.C. § 727(d), the complaint seeks

revocation of the discharge as to both Jacky and Carline. In support of both counts, the complaint

alleges that he, Vil, did not know of the fraud until after the discharge was granted. Nowhere in the

complaint does Vil allege that he is a creditor of either debtor or allege facts that, if proven, would

support the conclusion that he is a creditor of Jacky or of Carline.

22.    Vil adduced almost no evidence that he did not know of the various alleged incidents of

fraud, the omissions that form the basis of his complaint for revocation, until after the discharge was

granted. His only evidence consisted of a single sentence of his own conclusory testimony, to the effect

that he did not know of the fraud until after the discharge was granted. He did not indicate what, if

anything, had occurred after entry of the discharge to make the alleged fraud apparent to him. He did

not indicate whether he had read the original SOFA and Schedules A and B before entry of the

discharge. The evidence shows that as to at least four alleged omissions on which Vil replies, Vil himself

had knowledge of the alleged omitted assets and entity even before the bankruptcy case was

commenced in 2009. He knew that Jacky was a member of FATEM's board of directors before the

bankruptcy filing in 2009; had he read the original SOFA when he first learned of the bankruptcy filing

and before entry of discharge, the omission of FATEM from item 18 of the SOFA would have been

apparent to him. He alleges that by virtue of communications that occurred in 2007, he learned that

Jacky owned two parcels of real estate in Haiti: a rental property and a vacant lot; had he read Schedule

A when he first learned of the bankruptcy filing and before entry of discharge, the omission of these

parcels would have been apparent to him.  And he himself has adduced evidence that he learned of

Jacky's alleged interest in a Mack truck back in 2007; had he read Schedule B when he first learned of

the bankruptcy filing and before entry of discharge, the omission of this truck from Schedule B would

have been apparent to him. In view of this evidence, I find that if Vil did not learn of the alleged

misstatements in the SOFA and schedules as to FATEM, the real estate in Haiti, and the truck before

entry of the discharge, it can only have been because he did not avail himself of the opportunity to read

the SOFA and schedules before the discharge.

23.     Vil has made no attempt to reconcile the evidence showing his pre-bankruptcy

knowledge of the real estate in Haiti, the truck, and Jacky's position with FATEM with his simple denial

that he knew of the alleged fraud until after entry of the discharge. As a result, I find that his conclusory

testimony—that he did not know of the fraud until after the discharge was granted—lacks credibility as

to every one of the omissions of which Vil now complains. The record contains no other evidence to

establish that Vil did not know of the alleged fraud until after the discharge. In fact, Vil's evidence (such

as it is) that Jacky had positions in unlisted entities consists almost entirely of documents he was able to

search for and download from a public database at the website of the Massachusetts Secretary of State.

Once he started searching for grounds on which to revoke the Debtors' discharge, Vil appears to have

had no trouble finding these documents. He has adduced no evidence that the same documents were

not available in the summer of 2012, when he might timely have objected to discharge before its entry

or, if more time to investigate were warranted, sought an extension of time to object to discharge.

24.     On August 28, 2013, the day after Vil filed the complaint, attorney Stefan Cencarik,

acting on behalf of both Jacky and Carline, sent to Vil a letter explaining that, in the Debtors' view, the

complaint constituted a violation of Fed. R. Bankr. P. 9011(b)(1) and (3) and demanding that it be

withdrawn within 21 days. In the letter, Cencarik listed various defects that, he contended, caused the

filing of the complaint to run afoul of, among other parts of Rule 9011(b), Rule 9011(b)(3)'s requirement

that the allegations in a complaint have evidentiary support, including (i) with respect to § 727(d), "if

you are not a creditor or the Poteaus, you have no legally protected interest that enables you to make a

request to revoke their discharge"; and (ii) with respect to § 727(a), "[t]his statute applies prior to the

entry of the Debtors' discharge and only provides creditors the legal standing to file suit under this sub-

section." In response, Vil took no action; he did not voluntarily dismiss his complaint (or any portion of

it) as against either defendant. The record contains no evidence that Jacky, or any attorney acting on his

behalf, served the Rule 9011 Motion on Vil before he filed it in court.

25.     At no time has Vil suggested, much less adduced evidence, that he has or had a claim

within the meaning of 11 U.S.C. § 101(5) (defining claim for purposes of the Bankruptcy Code as "a right

to payment" or "a right to an equitable remedy for breach of performance if such breach gives rise to a

right to payment") against Carline. Though Vil's rights were affected by Jacky's discharge, they have not

been affected by *Carline's* discharge.

26.     On November 4, 2013, Jacky and Carline filed a joint motion to dismiss Vil's complaint

for failure to state a claim on which relief could be granted. On January 8, 2014, at a hearing on the

motion, Vil stated that he had no knowledge that Carline had engaged in any of the conduct on which

the complaint was founded. Accordingly, the Court dismissed the complaint for revocation as against

Carline.

27.     On January 31, 2014, Carline then filed her motion for sanctions against Vil under Fed. R.

Bankr. P. 9011(b)(1), (2), and (3) for filing the complaint in this adversary proceeding against her without

a reasonable factual basis for doing so (both counts), without warrant in existing law (Count I only), and

solely to harass (both counts) (the "Rule 9011 Motion"). Nowhere in the Rule 9011 Motion does Carline

indicate that she served the motion on Vil at least 21 days before she filed it in court. The certificate of

service that was filed with the motion indicates that counsel served it on Vil on the same day as he filed

it in court; it indicates no other, earlier service. No evidence was adduced at the trial/evidentiary

hearing that the motion was served on Vil prior to being filed in court.

28.     Vil alleges that, on the petition date, Jacky owned three assets that he failed to list in

the schedules he filed with his petition: (i) a parcel of real property in Mirebalais, Haiti, identified as

rental property located near a soccer field; (ii) another parcel of real property in Mirebalais, Haiti,

identified as vacant land in an area known as Children's Park; and (iii) a Mack truck that Jacky had

shipped to Haiti in 2007. Vil has not carried his burden of proving that Jacky owned any of these assets

when he filed his bankruptcy petition.

29.    With respect to the rental property, Vil testified that, while he and Jacky were in Haiti

together in 2007, Jacky told Vil that he owned this property. Jacky denied that he ever said this to Vil

and that he ever owned the property. He testified that the rental property had belonged to his father,

who, at some point not in evidence, transferred it to Jacky's brother, Raphael Poteau.  Jacky's testimony

is corroborated by an affidavit from Raphael in which Raphael averred that he, Raphael, is in fact the

owner of the property; that Jacky is not an owner of the property; that he, Raphael, at his own expense,

built the single family house on the property as a place for his father and mother to live upon returning

to Haiti from the United States; that this house was finished and habitable on the first floor but not on

the second; that he has lived at the property, in a house in the back of the property, since before his

father's death in 2012; and that he has no documentary evidence of his ownership of the property, all

records in the local registry having been destroyed in the earthquake of 2010. It is also corroborated by

a master lease agreement, dated January 10, 2010, between Raphael as owner/lessor and FATEM as

lessee for lease of the rental property, and by a form entitled "Landlord Consent," signed by Raphael as

lessor, in which he thereby signified his consent to FATEM's sublease of the same property to 1000

Jobs/Haiti, Inc.  Raphael was not called as a witness at trial. His affidavit, and the lease, sublease, and

consent form were admitted into evidence by agreement. Jacky's denial that he ever owned the

property is contradicted by an email that he sent to the other owners of GPN Management, Inc., on June

17, 2011, about pulling their respective investments/contributions out of GPN. In it Jacky said: "I'd like

to pull out as well, and use the money I have contributed to do some work on *my rental property in

Mirebalais*; it's been sitting there because I don't have any money." (Emphasis added.) When asked at

trial about his reference in this email to "my rental property in Mirebalais," Jacky testified that it was

untrue, that he had made it up as a reason to ask for his money back, because he had not wanted to tell

his colleagues the real reason, that he was struggling financially. This response is unsatisfying, not

credible,[2] but I am still left with Raphael's affidavit and especially the lease and consent to sublease,

both of which, it is uncontroverted, Raphael signed as owner of the property. Vil, not Jacky, bears the

burden of proof here. The evidence does not preponderate in favor of a finding that Jacky ever owned

the property or that his omission of it from Schedule A was a false statement.

30.     With respect to the vacant land, the only evidence that Jacky ever owned it is, once

again, Vil's testimony that, while he and Jacky were in Haiti in 2007, Jacky told Vil that he owned this

property. Jacky denies that he said this and that he owns this property. The evidence does not

preponderate in favor of a finding that Jacky ever owned this property or that his omission of it from

Schedule A was a false statement. It was Vil's burden to prove these facts, and he did not.

31.     With respect to the truck, Jacky testified that in 2007, he owned a Mack truck that was

some 15 years old, in need of considerable repair, and of little or no value to him. Jacky also testified

credibly that in 2007, he arranged to and did donate and send the truck to an organization in Haiti,

which planned to make it available for use by farmers there, to move equipment and transport crops to

markets. The cost of transporting the truck to Haiti was borne by the donee organization. Vil has

adduced no evidence that Jacky continued to own the truck when he filed his bankruptcy petition.  The

evidence does not preponderate in favor of a finding that Jacky owned the truck when he filed his

bankruptcy petition or that his omission of the truck from his Schedule B was a false statement.

---

[2] I find credible Jacky's testimony that he did not want to tell his colleagues of his financial distress; at the trial of
this adversary proceeding in 2014, John Erick Noel, who was a long-time friend of Jacky and was involved with
Jacky in both FATEM and GPN, learned for the first time of Jacky's bankruptcy filing. However, I find less credible
that Jacky would have made up this particular excuse to hide his need for the money.  Moreover, at best, Jacky is
here testifying that he has no trouble making things up in dealings with his long-time friends and business
colleagues, which only lowers my estimation of his credibility in general.

19

32.     Of the nine entities that were listed in Jacky's response to item 18 in the amended

SOFA, Vil identified only three whose omission from the original SOFA he now contends constituted

fraud: FATEM, GPN Management, Inc., and Oasis Global Enterprises, Inc.[3]

33.     FATEM was and remains a nonprofit corporation, and within the six years before his

bankruptcy filing, Jacky was one of its directors, albeit on an unpaid basis.[4] Though its business was

nonprofit in nature, and Jacky therefore had no equity interest in it, FATEM was nonetheless a business.

Jacky was therefore required to list FATEM in his response to item 18, and his omission of FATEM was a

false statement. Vil does not contend, and has introduced no evidence, that the omission of FATEM

from item 18 served to hide assets or claims from the trustee or otherwise to ease Jacky's path to

obtaining a discharge or to gain him advantage in his bankruptcy case.

34.     GPN Management, Inc. ("GPN") is a Massachusetts for-profit corporation that Jacky and

three colleagues formed in December 2005. Jacky was its vice-president and one of its four directors.  It

was envisioned by its four owners as a vehicle for the four to explore and pursue various business ideas

together, whether in Mirebalais or here in the United States, but it never did business of any kind and

made no money. At its inception, each of its four owners, Jacky included, contributed $100 or $120 to

the corporation to open a bank account in its name and to fund organizing costs, annual filing fees, and

the like.  It is evident that they must later have made further donations of similar magnitude, because,

as John Erick Noel, one of the four owners, testified at trial, upon GPN's dissolution in 2011, it had

between $1500 and $2000 in its coffers. Still, no owner ever invested more in this corporation than his

---

[3] Two of the remaining six (Oasis Global Enterprises, LLC and National Haitian American Health Alliance, Inc.)
appear to have been created only after the commencement of the bankruptcy case, and therefore their omission
cannot have been false or fraudulent. Three others (Cychama, Inc., 1000 Jobs/Haiti, Inc., and Destined for Grace
Children's Relief) are listed as nonprofit corporations, and the record contains no evidence to contradict that they
are nonprofit. And as to the last (SODECOM, LLC), the listing indicates that the Debtors held no shareholder or
ownership interest in it; and the record includes no evidence to the contrary.  There is no evident motive or
purpose to defraud in Jacky's omission of these entities.

[4] Jacky received no compensation from FATEM until he became its executive director, sometime in the middle of
2010, roughly ten months after his bankruptcy filing.

or her share of the funds needed to fund annual reporting and filing requirements. GPN never filed a tax return because it never had income. The co-owners discussed a business plan, an operating agreement, and bylaws but never agreed on or adopted any of these. GPN never distributed stock certificates to its equity owners. It had no rented office.  There is no evidence that it ever owned an asset other than the cash in its bank account, all of it derived from owner contributions.

35.    Whether Jacky's interest in GPN Management, Inc. had value at the time of his bankruptcy filing or not, Jacky was required to list it in his response to item 18, and his omission of it was a false statement.[5]

36.    There is no evidence of precisely how much money GPN held in its bank account in 2009 when Jacky and Carline filed their bankruptcy petition, of the extent of its debts at the time (if any), or of the value of each owner's share in the corporation at the time.

37.    In June 2011, one of GPN's equity holders circulated an email to the others, indicating his desire to withdraw from GPN, and indicating that "the few dollars I have coming to me" would be better invested elsewhere. Jacky responded to all that he, too, would like to pull out and use the money he had contributed elsewhere.  This exchange precipitated discussions among the equity holders that led to the liquidation of GPN, with each of the equity holders receiving a distribution. John Erick Noel testified that each received back between $200 and $300. Jacky testified credibly that "I had less than $500 come back to me." The precise amount he received is not in evidence. GPN was dissolved no later than June 2012.  At the time of its liquidation in 2011 or 2012, GPN had value to Jacky in the amount that he received upon its liquidation.

---

[5] Jacky was also required to list his interest in GPN Management, Inc. on his schedule of personal property, at item 13, which required disclosure of all "stocks and interests in . . . incorporated businesses." Here, too, Jacky answered "none." This omission is not a basis on which Vil is relying.

38.     Jacky has adduced no evidence that the value of his interest increased after he filed his bankruptcy petition. I therefore conclude that Jacky's interest at the time of his filing was no less than what it was upon liquidation in 2011 or 2012.

39.     Oasis Global Enterprises, Inc. was created in 2008 and became inactive in 2009. Jacky was involved in this corporation in some capacity, but precisely how is not in evidence. The only evidence of Jacky's role in this corporation was his testimony: "I was under original group that come together. I remain as part of the discussions, but I don't have any active role." There is no evidence of the nature of its business or whether it was for-profit or not-for-profit. There is no evidence that Jacky was a shareholder, director, or officer of the corporation, much less that it had any value to him at the time of his bankruptcy filing. In 2011, a limited liability company was formed with the name Oasis Global Enterprises, LLC. Jacky described the nature of this LLC's business in his amended SOFA as "construction job training and local business/real estate development in Mirebalais, Haiti." Jacky testified that the LLC involved "a different group of people," some of whom had participated in Oasis Global Enterprises, Inc. The record contains no other evidence as to either of the Oasis Global entities. I cannot find that Jacky had a role in Oasis Global Enterprises, Inc. that required that he list it in item 18 of the original SOFA, nor that his omission of this entity was a false statement.

40.     Jacky denied that his omission of FATEM, GPN Management, Inc., and the other entities that he was required to list in item 18 was *knowingly* false: he testified that he understood item 18 to require disclosure of only those businesses in which he had an ownership interest.[6] He conceded that this was a mistake but maintained that it was only a mistake, not an intentional omission of information known to be required. As further explanation for his error, Jacky testified that when he filed his bankruptcy petition and the original SOFA, he was under a great deal of stress and was unable to focus.

---

[6] Jacky's testimony about knowledge of falsity and intent was not specific to any one entity. He always testified about all the required-but-omitted entities as a group.

Case 13-01346    Doc 235    Filed 11/28/16    Entered 11/28/16 15:41:19    Desc Main
Document    Page 23 of 33


He was having trouble paying his debts. A family car had been repossessed. Carline had lost a part-time

job. His parents were both living with his family and had troubles that Jacky frequently had to deal with.

His eldest daughter was ready to go to college, but Jacky wasn't prepared financially.

41.    Jacky's testimony might be credible if the only omitted entities were non-profit, such as

FATEM. But the omitted entities included a for-profit entity, GPN Management, in which Jacky did have

an ownership interest. Jacky implies that GPN had no value, and therefore his interest in it was also of

no value, and therefore it was not truly an interest at all. This logic would not have kept Jacky from

having to list GPN in his response to item 18; nor do I find that he relied on any such logic. And in any

event, though GPN had little value to Jacky at the time of his bankruptcy filing, and certainly was not a

font of revenue, it nonetheless had *some* value to him. In short, Jacky's excuse for not listing FATEM and

GPN is not credible, and I find that the omission of these entities was knowing.

42.    With respect to FATEM, Vil has not proven that the omission was made with intent to

hide assets from the trustee or to gain some advantage in bankruptcy. I find no evident sinister purpose

in Jacky's nondisclosure of this unpaid position with a nonprofit entity. Even with respect to GPN, it is

unclear whether Jacky omitted his position with GPN in an attempt to hide value. His interest in GPN

probably had some value, but also probably not much, only $200 to $300.  It is doubtful that Jacky was

motivated by a desire to hide this small value, especially since it was not readily available even to him—

it would not have been available to him except upon dissolution of the corporation.  It is also unlikely

that the trustee would have seen any value for creditors in this interest (that is, after costs of

investigation, liquidation, and distribution), and, had it been listed, the trustee might well have

abandoned the interest back to Jacky. The only evident possible motive for nondisclosure is Jacky's

desire to keep his bankruptcy under wraps: he would not have wanted the trustee to contact his

business associates in FATEM and GPN.

23

Document    Page 24 of 33

**JURISDICTION**

The matters before the court are a complaint under 11 U.S.C. § 727(d) to revoke a debtor's

discharge in bankruptcy and a counterclaim to enforce by contempt process the same discharge. Both

arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given

the district court in 28 U.S.C. § 1334(b) and, by standing order of reference (codified in the district

court's local rules at L.R. 201, D. Mass.), referred to the bankruptcy court  pursuant to 28 U.S.C. § 157(a).

Both are core proceedings within the meaning of 28 U.S.C. § 157(b)(1).  28 U.S.C. § 157(b)(2)(M) and (O)

(core proceedings include objections to discharge and other proceedings affecting the adjustment of the

debtor-creditor relationship). The bankruptcy court accordingly has authority to enter final judgment as

to both matters and to rule on the attendant Rule 9011 Motion.

**CONCLUSIONS OF LAW**

    **1.   Revocation of Discharge**

Vil seeks revocation of Jacky's discharge under 11 U.S.C. § 727(d) without specifying the

particular subsection under which he is proceeding. Of the four subsections of § 727(d), only the first

can plausibly apply here.[7] It states: "[o]n request of the trustee, a creditor, or the United States trustee,

and after notice and a hearing, the court shall revoke a discharge entered under subsection (a) of this

section if such discharge was obtained through the fraud of the debtor, and the requesting party did not

know of such fraud until after the granting of such discharge." 11 U.S.C. § 727(d)(1). A simple parsing of

this statutory language establishes two requirements for revocation of discharge. First, the discharge

must have been obtained through the fraud of the debtor. And second, the requesting party must not

have known of the fraud until after granting of the discharge. "The party seeking revocation bears the

burden of proving each of these elements by a preponderance of the evidence." *Yules v. Gillis (In re*

---

[7] It is also the only subsection that Vil cited or relied upon in his response to the Debtors' motion to dismiss his
complaint for revocation.

*Gillis)*, 403 B.R. 137, 144 (1st Cir. BAP 2009). "Because revoking a discharge is an extraordinary remedy, §

727(d) should be construed liberally in favor of the debtor and strictly against those objecting to

discharge." *Id*.

The second requirement—that the requesting party did not know of the fraud until after

granting of the discharge—requires an affirmative showing of lack of knowledge, not merely a lack of

evidence of knowledge. In addition, the cases are in agreement that the requesting party is charged with

knowledge of such fraud as would have been discovered had he or she exercised due diligence in

investigating facts that a reasonable person would have understood to signal possible fraud. "[I]n a

revocation action under § 727(d)(1), the plaintiff must show due diligence in investigating and

responding to possible fraudulent conduct once he or she is aware of it or is in possession of facts such

that a reasonable person in his or her position should have been aware of a possible fraud." *In re

Vereen*, 219 B.R. 691 (Bankr. D. S.C. 1997) and cases cited. "[D]ismissal of a § 727(d)(1) revocation action

is proper where, before discharge, the creditor knows facts such that he or she is put on notice of a

possible fraud." *Mid–Tech Consulting v. Swendra*, 938 F.2d 885, at 888 (8th Cir.1991).

With respect to each of the six omissions on which Vil is now proceeding—the truck, the rental

property, the vacant lot, Jacky's positions with FATEM and GPN Management, Inc., and Jacky's alleged

position with Oasis Global Enterprises, Inc.—Vil has failed to carry his burden of proof as to lack of

knowledge. His only evidence on this issue is his own conclusory testimony, which I have found not

credible. Although it is clear that he had knowledge of the bankruptcy case approximately 80 days

before the deadline for objecting to discharge, Vil has adduced no evidence that he even read the

schedules and SOFA before that deadline. In addition, the record affirmatively establishes that Vil was

aware before the bankruptcy filing of the three assets—the truck and two parcels of real estate in

Haiti—that Vil now says Jacky fraudulently omitted from his schedules, and that Vil was aware of Jacky's

directorship of one of the entities (FATEM) that he now says Jacky fraudulently omitted from the original

SOFA. Had he read the schedules and SOFA before entry of discharge, he would have been on notice of

the omission of the three assets and the one entity; and, by a search of the secretary of state's

database, he would readily have discovered the omission of Jacky's position with GPN Management, Inc.

as well. In fact, Vil does not indicate precisely how he came to know of GPN and Jacky's position with it;

it is not at all established that he was not already aware of these in time to object to discharge in the

summer of 2012, and the burden is on Vil to establish that fact.  Vil having failed to carry his burden of

proof as to lack of knowledge, his complaint for revocation of discharge must be dismissed.[8] In view of

Vil's complete lack of proof as to this essential element of his case, I need not address the precise nature

of the fraud that is required by § 727(d)(1)—especially the specific intent it may require and the

requirement that the discharge have been "obtained through the fraud"—and whether Vil has

established it here with respect to Jacky's knowing omissions of FATEM and GPN Management, Inc.

With respect to the omission of the truck and the two parcels of real estate in Haiti and the

omission of an alleged position with Oasis Global Enterprises, Inc., the complaint for revocation also fails

for the additional reason that Vil has not proven that their omission was a false statement, much less

fraud in obtaining the discharge. And with respect to the truck and the vacant real estate in Haiti, the

complaint also fails for the further reason that the omission of these items was not identified in the

complaint or before trial as a basis on which Vil was proceeding. Fraud must be pled with specificity.

Until near the end of the trial, Jacky had no notice that he was defending against counts based on

omission of these assets.

---

[8] In his complaint, Vil appeared to contend that certain alleged false statements in the amended SOFA constituted
additional grounds for revocation of discharge. In view of Vil's clarification at trial of the misstatements on which
he was then proceeding, I conclude that Vil is no longer relying on alleged false statements in the amended SOFA
(if in fact he ever was relying on them). Insofar as he may continue to rely on those statements, I conclude that
they fail as a matter of law.  Subsection 727(d)(1) requires revocation of discharge only where the discharge was
"obtained through the fraud of the debtor." Statements made *after* entry of discharge cannot have enabled the
debtor to obtain the discharge.

### 2.   Contempt of Discharge Injunction

Jacky has filed a counterclaim against Vil for injunctive and monetary relief for Vil's violation of the discharge by his filing and prosecuting of his amended complaint in the District Court action against Jacky. He contends that the prosecution of the amended complaint constitutes contempt of the discharge injunction, whose scope and effect are set forth at 11 U.S.C. § 524(a)(2), and that the Bankruptcy Court may redress such contempt pursuant to its powers at 11 U.S.C. § 105(a). For this contempt, the Counterclaim demands (i) sanctions in the amount of $50,000 to deter further contempt and retaliatory conduct, (ii) an order permanently enjoining Vil from filing any petition or request for relief against Jacky and Carline without first satisfying certain conditions, and (iii) reasonable attorney's fees and expenses.

The law governing redress for violation of the discharge injunction is set forth in *In re Schlichtmann*, 375 B.R. 41 (Bankr. D. Mass. 2007):

> The Bankruptcy Code provides no express remedy . . . for violation of the discharge. A debtor may enforce the discharge injunction only through contempt proceedings. As set forth above, the bankruptcy court has authority under 11 U.S.C. § 105(a), and perhaps also inherently, to enforce the discharge by issuance of contempt orders and imposition of contempt sanctions. *Bessette v. Avco Financial Services, Inc.*, 230 F.3d at 444–45 [(1st Cir. 2000)]; *McDonald v. Norwest Financial, Inc. (In re McDonald)*, 265 B.R. 3, 8–9 (Bankr.D.Mass.2001) (construing *Bessette* as requiring enforcement by contempt proceedings). The proceeding being in the nature of contempt, the debtor's burden of proving contempt, a violation of the discharge, is the clear and convincing standard.
>
> In order to establish civil contempt of the discharge order, such as would justify a sanction in the form of compensatory damages and attorney's fees, the Debtor must prove that (i) the alleged contemnor committed an act that violated the discharge with general intent to commit the act and (ii) with knowledge of the discharge order. Due process further requires that the discharge order, or the relevant provisions of law that define its scope, be clear and unambiguous as to whether the conduct in question is prohibited. However, neither specific intent to violate the discharge order nor bad faith is required.

*Schlichtmann*, 375 B.R. at 94-95 (citations omitted).

The first step is to determine whether Vil, the alleged contemnor, violated the discharge. To a large extent, that has already been done:  in the District Court action in which Jacky first filed this counterclaim, Judge Casper ruled that the various claims for relief that Vil asserted against Jacky in his amended complaint were subject to and barred by the discharge.[9] I rely on Judge Casper's reasoning and rulings and need not reiterate them here. They suffice to establish that Vil's filing and prosecution of the amended complaint in the District Court action constituted an attempt to collect discharged debt as a personal liability of the debtor, Jacky. By statute, a discharge in a case under the Bankruptcy Code

> operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(2). Vil's filing of his amended complaint, and his defense of that complaint against two motions by Jacky to dismiss it, one to dismiss for failure to state a claim on which relief can be granted and the other to dismiss as barred by the discharge, constituted violations of Jacky's discharge. I further find that Vil committed these violations with general intent to commit the acts that constituted the violations: his filing of the amended complaint, and his defense of that complaint against motions to dismiss it.

Jacky must further establish that Vil committed these acts with knowledge of the discharge order. I find by clear and convincing evidence that Vil received the discharge order shortly after it entered and that he was well aware of the discharge when he filed his amended complaint and later defended it against motions to dismiss (one of which was based on the discharge itself).

Vil nonetheless argues that though he knew of the discharge, he did not understand that he was a "creditor," and therefore, he seems to imply, he did not understand the discharge to apply to the claims he asserted against Jacky in the District Court action. I find this testimony not credible. Though Vil

---

[9] The District Court action ended with entry of judgment on the merits against Vil and in favor of the defendants on March 3, 2015, and Vil took no appeal from that judgment.

focused on the word creditor, he made no attempt to explain why it mattered in his reasoning. In any event, Vil's subjective understanding of the scope of the discharge is irrelevant. Jacky's burden is to prove only that Vil knew of the discharge, not that he acted with knowledge that he was violating it, or with intent to violate it.

If Vil is suggesting that the discharge injunction, which is statutory, was somehow unclear about its application to his claims against Jacky, such that he should not be charged with knowledge of the injunction, I reject that argument as a matter of law. The applicability of the discharge to the claims at issue is straightforward, not a question of new or unsettled law.[10] And ignorance of law is no defense, even for one who has elected not to seek the advice of counsel.

In any event, Vil has not established that he was ignorant of the law. I find that he knew that the discharge applied to his claims against Jacky—or at least that it was very unlikely that the law was otherwise—and chose to disregard the discharge.

For these reasons, I conclude that, by his filing and prosecution of the amended complaint in the District Court action, Vil was acting in contempt of the discharge injunction.

There remains the question of appropriate sanctions. Sanctions for contempt of an order may include compensation to the injured party and such further award, or other order, as may be necessary to compel compliance going forward. *Eck v. Dodge Chemical Co. (In re Power Recovery Systems, Inc.)*, 950 F.2d 978, 802 (1st Cir. 1991) ("Sanctions in a civil contempt proceeding are employed to coerce the defendant into compliance with the court's order or, where appropriate, to compensate the harmed party for losses sustained. These sanctions are not punitive, but purely remedial."). "Where the purpose of a monetary sanction is to make the defendant comply, the court has wide discretion in considering the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about compliance and the like." *Id*. Compensatory

---

[10] The relevant statutory provisions are set forth in Judge Casper's decision and need not be reiterated here.

damages may and should include the attorney's fees incurred to enforce the discharge, so that the

debtor is no worse off for having enforced the discharge. *Duby v. United States (In re Duby)*, 451 B.R.

664, 675-77 (BAP 1st Cir 2011) (debtor entitled to attorney's fees incurred in enforcing the automatic

stay). Compensatory damages may also include damages for emotional distress.  *In re Young*, 2014 WL

1379111, at *4 (Bankr. D. Mass. Apr. 8, 2014) and cases cited ("Emotional distress is an actual injury for

which a debtor may recover damages."); *In re Perviz*, 302 B.R. 357, 371-72 (Bankr. N.D. Ohio 2003). The

purpose of the discharge is to afford the debtor a fresh start, a significant component of which is being

free of the kinds of harassment, threats, and anxiety that debtors suffer before they seek bankruptcy

relief; emotional distress damages are therefore an important component of damages for violation of

the discharge. *In re Gervin*, 337 B.R. 854, 863 (Bankr. W.D. Tex. 2005), *rev'd on other grounds*, 300 F.

App'x 293 (5th Cir. 2008).

Vil's violation of the discharge injured Jacky in three ways:  by causing him to incur attorney's

fees to defend against Jacky's amended complaint in the District Court action; by causing him to incur

attorney's fees to prosecute the present counterclaim, first in the District Court action and then in the

current adversary proceeding; and by causing him emotional distress.  I will address each in turn.

Vil's amended complaint caused Jacky to incur attorney's fees to defend against the amended

complaint in the District Court action. Among other things, counsel filed, on behalf of Jacky and the

other four defendants, a joint motion to dismiss for failure to state a claim on which relief could be

granted, and counsel also filed a separate motion to dismiss the claims against Jacky on the separate

basis that they were barred by his discharge in bankruptcy. Jacky has adduced no evidence of the

attorney's hours incurred in these defensive efforts.  In order to avoid further process, I find that the

motions to dismiss and related attorney's services (counseling, collection of information, etc.) should

reasonably have taken eight hours of attorney time on behalf of Jacky. Jacky's counsel charged $300 per

hour, a rate that I find reasonable. Accordingly, I award $2,400 in attorney's fees for Jacky's defense against the amended complaint.

Vil's amended complaint also necessitated Jacky's present counterclaim, for enforcement of the discharge. Through counsel, Jacky first asserted the counterclaim in the District Court action and defended it there against a motion by Vil to dismiss it. After denying Vil's motion to dismiss it, the District Court referred the counterclaim to this court for adjudication. In this adversary proceeding, Jacky's attorney then amended the counterclaim, conducted discovery as to it, briefed and attended hearings concerning discovery disputes, filed a pretrial memorandum as to the counterclaim (and Vil's complaint for revocation), prepared for trial of the counterclaim, attended a status conference and a pretrial conference, and, over a day and a half of trial, tried the counterclaim (along with Vil's complaint for revocation and Carline's Rule 9011 Motion). I am mindful that much of the work counsel did in support of the counterclaim also supported Jacky's defense of the complaint for revocation. While I award no fees for time expended solely on that defense, I also do not discount the time spent on the counterclaim just because it also served another purpose. It all was time that counsel was required to spend in prosecution of the counterclaim. However, where a single time entry, such as for trial preparation, includes time spent on the counterclaim but also time spent on other matters that do not relate to the counterclaim, I must and have estimated the portion that pertains to the counterclaim.  I estimate the time spent on the counterclaim in the District Court action at 5 hours. On the basis of evidence submitted by Jacky of the time expended by his attorney on this adversary proceeding up to the start of trial, I find that counsel expended 26 hours on the counterclaim up to the beginning of trial.[11] I quantify counsel's trial time on the counterclaim at 8 hours. I therefore award attorney's fees for 39 hours [5 + 26 + 8 = 39] at $300 per hour, or $11,700, for time expended on the counterclaim.

---

[11] This sum has been adjusted downward to avoid double counting of attorney's fees that were awarded to Jacky earlier in this adversary proceeding for Vil's failure to appear at a scheduled deposition.

The third component of damages here is emotional distress. Jacky testified credibly that Vil's campaign against him since the incident concerning the criminal complaint has severely and adversely affected his emotional health and his marriage. He is anxious about Vil's threats and about the expense in legal fees that this campaign has necessitated, and that Jacky and Carline can ill afford. He lives in fear at times and at one point sought and obtained a restraining order against Vil.  This persecution has brought out the worst in him. On the present counterclaim, Jacky is entitled to emotional distress damages not for this whole campaign, but only for the portion of it that Vil prosecuted by violating Jacky's discharge through the amended complaint in the District Court. Still, I may take into consideration that Vil's disregard of the discharge intensified an already difficult emotional situation, in part because, by it, Vil demonstrated a manic relentlessness that refused even to respect a federal injunction, a show of force that was intended to and did have a compounding effect on Jacky's emotional health. For this emotional distress I find it appropriate to award an additional $5,000.

In summary, the Court will award damages for contempt of the discharge in the total amount of $19,100, including $2,400 incurred to defend against the amended complaint, $11,700 to prosecute the counterclaim, and $5,000 for emotional distress.

Jacky also seeks injunctive relief: an order permanently enjoining Vil from filing any petition or request for relief against Jacky or Carline in any state or federal forum without first satisfying certain requirements. The counterclaim is unclear about precisely what those requirements would be. I am satisfied that no further injunctive relief is necessary. The discharge itself is an injunction that continues in effect. This court would react swiftly and strongly to sanction any further contempt of the discharge, and Vil should take particular notice of this admonition.

### 3.  The Rule 9011 Motion

Carline has filed a motion for sanctions against Vil for filing his complaint against her in violation of Fed. R. Bankr. P. 9011(b)(1), (2), and (3). A party seeking sanctions for violation of Rule 9011(b) must, before filing the motion, serve it on the party to be sanctioned and thereby afford that party a 21-day period to withdraw or correct the challenged claim. Fed. R. Bankr. P. 9011(c)(1)(A). Compliance with the service requirement is mandatory, a prerequisite to an award of sanctions under Rule 9011. *The Cadle Company v. Pratt (In re Pratt)*, 524 F.3d 580, 587-88 (5th Cir. 2008). Here Carline has not satisfied that requirement. Instead, she sent Vil a letter explaining that the complaint constituted a violation of Fed. R. Bankr. P. 9011(b)(1) and (3) and demanding that it be withdrawn within 21 days. Such informal notice does not satisfy the safe-harbor requirement in paragraph (c)(1)(A). *Id.* at 588 (and cases cited); *Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 767 (6th Cir. 2014) (informal warning letter does not suffice under Fed. R. Civ. P. 11).  The Rule 9011 Motion must therefore be denied.

### CONCLUSION

For the reasons set forth above, the Court will, by separate judgment, dismiss the complaint for revocation, award sanctions in the amount of $19,100 for contempt of the discharge, and deny the Rule 9011 Motion.

Date:  November 28, 2016

_____
Frank J. Bailey
United States Bankruptcy Judge